MALLOY, Respondent, v. SWEAZEA, Appellant.

St. Louis Court of Appeals, February 19, 1907.

PRACTICE: Prima Facie Case: Breach of Contract. In an action on a promissory note where the defendant filed several counterclaims demanding damages against plaintiff for violation of a contract respecting chattels covered by a mortgage securing the note sued on, the evidence is examined and held insufficient to make out a *prima facie* case on the counterclaims and a peremptory instruction to find for plaintiff was proper.

Appeal from Carter Circuit Court.—*Hon. W. N. Evans,* Judge.

AFFIRMED.

*Clark, Sheets & Yount* for appellant.

GOODE, J.—This is an action to recover the balance due on a promissory note, originally given October 1, 1902, for $1,500, due two years after date and bearing interest at the rate of eight per cent per annum. Five credits had been entered on the note so that the balance sued for was reduced to $711.75. The petition is in the ordinary form. The answer admitted the execution of the note and then set up three counterclaims against plaintiff. Each of these counterclaims demanded judgment for a specific item of damages, alleged to have been suffered by defendant in consequence of plaintiff's breach of a certain verbal contract between the parties in reference to the subject-matter of the mortgage given to secure the note. The main allegations of the counterclaims are, in substance, that the note was given for the purchase price of sixty head of thoroughbred cattle and was secured by a chattel mortgage on the cattle; that after the execution of the chattel mortgage and note, it was agreed between the parties that at any time the defendant might desire, during the existence of the mortgage, he should have the privilege of shipping the cattle to the nearest market, or the market defendant might select, and selling the cattle in said market, provided defendant shipped them in the name of plaintiff and allowed him to collect the proceeds and apply the same on the note, paying the residue to defendant; that pursuant to this agreement, on or about the first day of August, 1904, defendant had sixty-eight head of cattle, being those covered by the mortgage and their increase, which he desired to sell at the National Stock Yards at East St. Louis, Illinois, and it was agreed on said date between him and plaintiff that defendant should ship the cattle to said market under the terms of their contract for shipment made "at the time of the execution of said chattel mortgage;" that plaintiff re-

quested defendant to drive the cattle to Piedmont, Missouri, ship them from there over the St. Louis & Iron Mountain Railroad, and turn over the bill of lading to the Exchange Bank at Piedmont for collection of the proceeds of the sale of the cattle; that in obedience to plaintiff's direction defendant drove the cattle to Piedmont from his home in Carter county, a distance of twenty miles and on arriving at Piedmont, plaintiff, without any just cause or excuse, refused to allow defendant to ship the cattle and notified the bank not to receive the bill of lading without plaintiff's consent in writing, telling defendant that if he shipped he would be liable to a criminal prosecution. In the first counterclaim, after reciting the facts aforesaid, defendant avers that in consequence of plaintiff's conduct, he (defendant) was compelled to drive the cattle back to Carter county and keep them at his own expense until the maturity of the mortgage; that when the mortgage matured, plaintiff foreclosed it and sold the cattle thereunder at a grossly inadequate price; that when defendant wished to ship them to the National Stock Yards they were worth, after deducting all the cost of putting them on the market, the sum of $1,700, and defendant's loss in price because of plaintiff's conduct, was $879.30, for which he prayed judgment. The second count of the counterclaim contained the same allegations with a renewal of the allegation regarding the expense defendant was put to in keeping the cattle from August 1, 1904, to November 19th of said year, which expense was laid at $200, and judgment prayed for this sum. The third counterclaim, after stating the above alleged facts, stated further that defendant was compelled to perform work and labor in caring for the cattle 109 days after they could have been shipped but for plaintiff's conduct, and that the said labor was reasonably worth $1.50 a day; for which sum multiplied by said number of days judgment was asked.

After admitting the execution of the note and chat-

tel mortgage, defendant offered witnesses in support of his counterclaim, but at the conclusion of the evidence the court gave a peremptory instruction for a verdict for plaintiff, which was returned and judgment having been entered in accordance therewith, this appeal was prosecuted. The petition avers in one place that the supposed contract on which the counterclaims are based, was made at the time the mortgage was executed, and in another place that it was made afterwards. We need not go into a discussion of the law which would govern the contract as dependent on when it was made, nor into the question of the inconsistency of the averments. We are relieved of this task by the fact that no substantial evidence to support the several counterclaims was offered. The testimony of Sweazea himself, if read as a whole, shows Malloy did not prevent him from shipping the cattle to the National Stock Yards when he was desirous of doing so, but only advised him against shipping them and that their return to Carter county was pursuant to the opinion of both parties that it was an inopportune time to ship. An extensive strike was in progress in St. Louis at that time and the price of cattle had sunk so low that those in controversy would have been sacrificed by selling them. According to Sweazea's statement, Malloy gave him written authority some time in July to ship the cattle to market on turning the bill of lading over to the Exchange Bank at Piedmont, so said bank might collect the proceeds. Sweazea drove the cattle to Piedmont in October and Malloy was there. They conferred about the expediency of sending the cattle to market at that time and evidently concluded not to do so. Sweazea said in answer to the question as to whether he and Malloy discussed the state of the market, that "they talked a lot about it" and Malloy told him not to ship; that he (Sweazea) waited on Malloy's orders. Sweazea was asked the direct question if Malloy told him he *could not* ship the

cattle, but instead of answering this question said he had already answered it. The plain meaning of his previous answers was that the expediency of shipping them was discussed and a decision adverse to doing so reached. Sweazea shipped one carload at the time and the testimony went to show the price obtained for them was so unsatisfactory that he did not choose to ship any more. Robinson, an employee of and witness for Sweazea, had assisted in driving the cattle from Carter county to Piedmont and stayed there with them four days, after which he went home. He testified that Sweazea went to St. Louis, leaving word with him (Robinson) that there would be a letter come for the latter to inform him whether or not Sweazea desired the cattle driven back home. This letter was written to Sweazea's wife, and pursuant to the directions contained in it, Robinson went to Piedmont to get the cattle, and when Robinson started back with them Sweazea was in St. Louis. Robinson gave this testimony:

"Q. Do you know why he (Sweazea) did not ship those cattle with the others? A. He went to St. Louis to sell the ones he had shipped to find out how cattle were selling."

Robinson also testified to hearing Malloy and Sweazea talking about shipping cattle and that they were considerably stirred up over the strike; that he (Robinson) was told by Malloy to try to get Sweazea not to ship, as it was dangerous to do so. It is to be borne in mind that Robinson was put on the stand by the defendant. Sweazea, and other witnesses, used such expressions as that Malloy "would not let the cattle be shipped" and that he admitted making a mistake "in not letting them be shipped." Separated from their context those statements look like Malloy interdicted the shipment of the cattle; but when read in connection with the other testimony of the witnesses, it is apparent that

the meaning is that the reasons advanced by Malloy against shipping influenced Sweazea.

The judgment was for the right party and it is affirmed. All concur.